# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

PATRICIA GARDNER HILTON,[1]

      Plaintiff,

v.                                      No. CIV 12-376 LFG

CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Plaintiff Patricia Hilton's ("Hilton") Motion to Reverse or Remand the Administrative Decision, filed August 17, 2012. [Docs. 19, 20.] The Commissioner of Social Security issued a final decision denying benefits, finding that Hilton was not disabled and, therefore, not entitled to Supplemental Security Income ("SSI") benefits. The Commissioner filed a response to Hilton's Motion [Doc. 23], and Hilton filed a reply [Doc. 24]. Having considered the pleadings submitted by the parties, the administrative record and the applicable law, the Court denies the motion. The Court's reasoning follows.

---

[1]This case was captioned "Patricia J. Hilton" [Doc. 1]; however, it appears that Plaintiff was divorced or remarried during the pendency of the case. Some of the records indicate her name as being Patricia Gardner. [AR 66.] Plaintiff's reply brief states her name as Patricia Gardner Hilton. [Doc. 24.] The Court refers to Plaintiff in this decision as "Hilton."

I.   **PROCEDURAL RECORD**

On November 13, 2009, Hilton applied for SSI, initially alleging she was disabled since March 1, 2006[2] [AR 130], due to bipolar affective disorder, anxiety, Hepatitis C, schizophrenia, post-traumatic stress syndrome ("PTSD"), and a learning disability. [AR 61, 153.] Hilton stated that she actually filed applications for DIB and SSI, but that there was insufficient evidence for proof of disability prior to the date she was last insured; thus she sought SSI only.  Hilton further provided that she would amend the onset date of disability to July 17, 2009,[3] although it is not clear why exactly Hilton selected that specific date for the onset. [AR 88.]  Hilton's SSI application was denied at the initial and reconsideration levels. [AR 59, 60, 73.]

On April 6, 2010, Hilton filed a request for an ALJ hearing, stating she was unable to engage in significant gainful activity due to severe psychiatric and physical impairments. [AR 78.] On March 8, 2011, the ALJ conducted a hearing, at which Hilton and her attorney appeared. [AR 24-58.] On April 18, 2011, the ALJ issued a decision finding that Hilton was not disabled and that she could perform a full range of work at all exertional levels but with nonexertional restrictions. [AR 14-15.] On June 3, 2011, Hilton requested review. [AR 6, 225.] On March 28, 2012, the Appeals Council denied Hilton's request for review, after consideration of Hilton's counsel's letter-brief. [AR 1-5.]  On April 12, 2012, she filed a Complaint for court review of the ALJ's decision. [Doc. 1.]

Hilton was born on October 4, 1967, and was 42 years old at the time of the ALJ hearing. [AR 17, 130.] Hilton attended special education classes in both elementary and middle school, and

---

[2]Some records indicate that Hilton stopped working as of March 1, 2006, because she was incarcerated then. [AR 153.] As noted, however, Hilton's earnings history was always sporadic.

[3]the ALJ used the application date of November 13, 2009, as the onset date. [AR 13.]

did not proceed past eighth grade.  She never attained a G.E.D.  Although Hilton worked as a babysitter and a maid at hotels, cleaned at the State Fair, and cooked, washed dishes, or waitressed at restaurants, this work was all short term. [AR 219, 132.]  She had no past relevant work and no significant earnings history.  The most she made was about $4156.00 in 2001. [AR 145.]

Hilton spent about a total of ten (10) years in jail or prison. [AR 273.] She was accused of or convicted of a felony or attempt to commit a felony. [AR 131.] She was incarcerated at New Mexico Women's Correctional Facility in Grants, New Mexico in about 2006-2007. [AR 156.] She is homeless, staying at shelters, or sometimes living with a friend who gives her a room to stay in. [AR 37, 271.] Hilton states she does not live anywhere permanently. [AR 131.] In about June 2009, she began obtaining healthcare treatment from Healthcare for the Homeless ("HCH"). [AR 262.]

Hilton's SSI application in November 2009, states she was married to John Hilton. [AR 130.] Other documents indicate that as of January 2010, Hilton was married twice and divorced once.  At that time, she was trying to file for divorce.  She had three children and one who passed away. [AR 271.] She also has grandchildren. [AR 259.]

Hilton has a history of substance and alcohol abuse from an early age, as well as a history of sexual abuse by family members, and physical abuse while living on the streets. [AR 336.]

## II.   STANDARDS FOR DETERMINING DISABILITY

In determining disability, the Commissioner applies a five-step sequential evaluation process.[4]  The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining her burden at each step, the burden then

---

[4]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[5]

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[6] at step two, the claimant must prove her impairment is "severe" in that it "significantly limits her physical or mental ability to do basic work activities . . . .;"[7] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[8] and, at step four, the claimant bears the burden of proving she is incapable of meeting the physical and mental demands of her past relevant work.[9]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's RFC,[10] age, education and past work experience, she is capable of performing other work.[11]

At step five, the ALJ can find that the claimant met his/her burden of proof in two ways: (1) by relying on a vocational expert's testimony; and/or (2) by relying on the "appendix two grids." Taylor v. Callahan, 969 F. Supp. 664, 669 (D. Kan. 1997).  For example, expert vocational

---

[5]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[6]20 C.F.R. § 404.1520(b) (1999).

[7]20 C.F.R. § 404.1520(c) (1999).

[8]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means her impairment is "severe enough to prevent him from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[9]20 C.F.R. § 404.1520(e) (1999).

[10]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[11]20 C.F.R. § 404.1520(f) (1999).

testimony might be used to demonstrate that the claimant can perform other jobs in the economy. Id. at 669-670. If, at step five of the process, the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove she cannot, in fact, perform that work.[12]

In this case, the ALJ proceeded through all five steps of the sequential process before determining that Hilton was not disabled. [AR 18.]

## III.    STANDARD OF REVIEW

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards. Langley v. Barnhart, 373 F.3d 1116, 1118 (10th Cir. 2004). To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance. Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003); Langley, 373 F.3d at 1118; Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004). The Court's review of the Commissioner's determination is limited. Hamilton v. Sec'y of HHS, 961 F.2d 1495, 1497 (10th Cir. 1992). The Court may not substitute its own judgment for the fact finder, nor re-weigh the evidence. Langley, 373 F.3d at 1118; Hamlin, 365 F.3d at 1214; Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991). Grounds for reversal also exist if the agency fails to apply the correct legal standards or to demonstrate reliance on the correct legal standards. Hamlin, 365 F.3d at 1114.

It is of no import whether the Court believes that a claimant is disabled. Rather, the Court's function is to determine whether the record as a whole contains substantial evidence to support the

---

[12]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

Commissioner's decision and whether the correct legal standards were applied.  Hamilton, 961 F.2d at 1497-98.  In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.  Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted).  If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.

After "careful consideration of entire record" [AR 13], the ALJ denied Hilton's request for SSI.  The ALJ determined Hilton had not engaged in substantial gainful activity since November 13, 2009, the SSI application date. [AR 13.]  The ALJ found that Hilton had the following severe impairments: "schizoaffective disorder, . . . PTSD, and polysubstance abuse."  [AR 13.]  The ALJ further found that none of Hilton's impairments or combination of impairments met listing criteria, specific to 12.03 or 12.06. [AR 13.] The ALJ thoroughly discussed her findings with respect to "B" and "C" criteria of those listings. [AR 13-14.]

Regarding Hilton's RFC, the ALJ determined that she retained the ability to perform "the full range of work at all exertional levels, but with the following nonexertional limitations: can perform work requiring little judgment; is limited to performance of simple duties with no public contact, occasional superficial contact with co-workers; and should not be required to work at a production and pace." [AR 14.]  The ALJ also found that some of Hilton's allegations concerning the effects of her impairments were credible, but she did not believe all of Hilton's statements were

"'fully credible' based on Hilton's 'on again off again' use of prescribed medications and sporadic counseling." [AR 15.] The ALJ found that when Hilton was compliant with medication, she was capable of engaging in work activity within the RFC. [AR 15.]  Hilton's impairments could reasonably be expected to produce some of the alleged symptoms, but Hilton's statements concerning the intensity, persistence, and limiting effects of the symptoms were not credible to the extent they conflicted with the described RFC. [AR 15.]

The ALJ fully addressed opinion evidence and evaluated "the medical records in their entirety." [AR 16.] She also considered the functional capacity assessments.  The ALJ explained how she assigned weight to the various medical opinions. [AR 17.] She further took under advisement counsel's request for psychological testing, but declined that request, based on her conclusion that sufficient evidence was available showing that "even with low level functioning, [Hilton] is capable of engaging in functional activities specified in . . . [exhibits] and as testified to by the vocational expert." [AR 17.]

The ALJ concluded that Hilton had no past relevant work as her earnings were not representative of substantial gainful activity. [AR 17.] Hilton was a younger individual, at age 42, had limited education, and was able to communicate in English. [AR 17.] Because of Hilton's nonexertional limitations, the ALJ relied on the grids as a framework and vocational expert testimony.  The vocational expert testified, that based on the hypothetical, including restrictions, Hilton could perform the requirements of a garment folder, cleaner/polisher, and garment bagger, all of which were light, unskilled jobs. [AR 18.] The ALJ concluded that Hilton did not meet the requirements for a disability. [AR 18.]

IV.   **MEDICAL HISTORY/BACKGROUND**

*2009 Medical Records:*

Hilton provides medical records, beginning in June 2009.  On June 8, 2009, RN Therese Ryan ("Ryan") saw Hilton at Healthcare for the Homeless ("HCH").  The HCH form-medical records include individualized information with respect to each visit, but they also include lists of diagnoses or statements that remain the same from record to record.  It is not always clear that these statements or lists are accurate as of the date of each medical visit or that the diagnoses are supported by examination or testing.  For example, almost all HCH medical records indicate that Hilton was "doubled up" the night before with respect to housing.[13] [*See, e.g.,* AR 253-55, 257, 250, 319, 334.] Yet, in some of these records, Hilton was noted as staying with a friend.  [AR 302, 319, 351, 371.]

As of June 8, 2009, Hilton reported she was doing all right but there was room for improvement.  Her urine test was clean, and she was congratulated for her success in remaining "clean" during the past week. [AR 262.] She had a staph infection.  On June 22, 2009, Ryan again saw Hilton who requested her prescription of Suboxone.[14]  In later medical records, Hilton stated

---

[13]It is not clear what HCH means by "doubling up," or if it is intended to convey that Hilton was sharing a room with someone in a shelter.

[14]"This medication contains 2 medicines: buprenorphine and naloxone. It is used to treat narcotic (opioid) dependence/addiction. Buprenorphine belongs to a class of drugs called mixed narcotic agonist-antagonists. Buprenorphine helps prevent withdrawal symptoms caused by stopping other opiate-type narcotics.  Naloxone is a narcotic antagonist that blocks the effect of narcotics and can cause severe narcotic withdrawal when injected. It has little effect when taken by mouth or dissolved under the tongue. It is combined with buprenorphine to prevent abuse and misuse (injection) of this medication. This combination medication is used as part of a complete treatment program for drug abuse (such as compliance monitoring, counseling, behavioral contract, lifestyle changes)." http://www.webmd.com/drugs (2/28/13)

her drug of choice had been opioids[15] by IV, that she started at age 12. [AR 336.] On June 22, Hilton reported having been clean since she was last seen in early June.  However, the urine test results, after Hilton left that day, were positive for opiates.[16]  Ryan intended to follow up with Hilton at her next appointment. [AR 260.]

On the next appointment with Ryan at HCH, on July 6, 2009, there is no mention of the positive urine results from June 22, 2009.  The record notes that Hilton was participating in the Suboxone program, was staying clean and enjoying her grandchildren. [AR 259.] These medical records list Hilton's medications as Celexa for depression and Suboxone.  The previous medical record indicated the same medications plus Depakote.[17] [AR 260.]  The current problems were noted as Bipolar, NOS, PTSD Chronic, Hepatitis C, Chronic, and Opioid Dependence. [AR 259.] There is no indication in the records as to how HCH arrived at these diagnoses as of these dates.

On July 20, 2009, Ryan saw Hilton who was there for the Suboxone program.  Her urine test was clean.  Diagnoses noted on the record were: Bipolar, NOS, PTSD Chronic, Hepatitis C, Chronic, and Opioid Dependence." [AR 257.] Many of these records indicate the medical visits were brief in nature, *i.e.,* five minutes. [AR 257.]

---

[15]"Opioid intoxication is a condition caused by use of opioid-based drugs, which include morphine, heroin, oxycodone, and the synthetic opioid narcotics." http://www.nlm.nih.gov/medlineplus/ency/article/000948.htm (2/28/13)

[16]Some HCH records indicate that Hilton had false positive lab results at times [AR 254, 255, 332], although it is not clear how HCH determined that the results were false positive for drugs.

[17]Depakote or "Valproic acid is used alone or with other medications to treat certain types of seizures. Valproic acid is also used to treat mania (episodes of frenzied, abnormally excited mood) in people with bipolar disorder (manic-depressive disorder; a disease that causes episodes of depression, episodes of mania, and other abnormal moods). It is also used to prevent migraine headaches, but not to relieve headaches that have already begun. Valproic acid is in a class of medications called anticonvulsants."  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682412.html (2/28/13).

On August 3, 2009, Hilton saw Seth Williams, "APRN, FNP."  The record notes a problem of "opiod [sic] abuse/ suboxone f/u." [AR 255.] Hilton reported she relapsed over the weekend, "did a line of cocaine from a dealer she does not know well, and drank 4 beers after finding out her daughter is pregnant, planning to get an abortion."  Hilton denied using opiates.[18]  This record states "hx multiple dirty urines.  Hx false positive for bzd's."  On this date, the urine screen was positive for opiates, Oxycontin, "Benzos," and positive for Suboxone.  After discussing the case with Ryan, who knew Hilton better, they decided not to refill Suboxone that date.  Hilton was to come in the next day for a repeat urine test. [AR 256.]

On August 5, 2009, Hilton presented for a refill of Suboxone.  Her urine was negative except for "Benzos."  The record states that Hilton had tested previously "false positive." [AR 254.] It is unknown from the records how HCH determined there were previous "false positives."

On August 14, 2009, Emily MacLeod with HCH saw Hilton.  Hilton's urine screen was negative and she was given Suboxone. [AR 253.] On August 24, Hilton was seen by Ryan again. All of Hilton's medical records indicate Hilton was a smoker.  Hilton's urine screen was clean.  She stated she did not take her "psych" medications the night before.  She claimed she was clean and attending weekly groups on Wednesday. [AR 252.] Hilton was given a schedule for NA/AA meetings.  It was not clear that she attended those meetings.

---

[18]Examples of opiates include morphine, codeine, and heroin, but not cocaine.

On September 8, 2009, Ryan saw Hilton for a 5-minute visit. Hilton agreed to go to one month visits for medications. She was attending the REC group[19] every week and was "going to AMCI[20] for individual counseling." [AR 250.] She was to continue taking Suboxone.

On October 13, 2009, Edmundo Apodaca, a social worker with HCH, evaluated Hilton. [AR 334.] Hilton was not taking her prescribed medications because she did not have the co-pay and she did not know she had insurance, although she apparently did. The record indicates Hilton needed medication because she reported hearing voices and starting to converse with herself. She stated she had mood swings and sometimes wanted to strangle people. She was happy one minute and depressed the next. She had symptoms of PTSD. She was anxious when she felt people around her. She slept only 3-4 hours a night. Her appetite and energy were poor. She denied any suicide attempts but reported having overdosed on four different occasions.

With respect to friends and family, Hilton stated she had a close male friend, but had also lost a friend and her childrens' father, both of whom were deceased. Her twin brother also attempted suicide. [AR 334.] She thought of killing herself but had no plan. Apodaca found Hilton's behavior inappropriate and also thought her appearance was odd. She had a strange look in her face and an inappropriate mood and affect. She heard voices but could not explain. She was paranoid. [AR 335.] She reported a history of drug abuse, having last used drugs on March 17, 2009. However, other records indicate she "did a line of cocaine" in August 2009. [AR 256.] She claimed

---

[19]"Re-Entry Collaborative Project (REC), medication-assisted treatment for individuals addicted to opiates, recently released from jail / prison and experiencing homelessness, including comprehensive, wrap-around social services, such as housing, case management, and client advocacy." http://www.centerfornonprofitexcellence.org/nonprofit-directory/albuquerque-health-care-homeless (2/28/13).

[20]"AMCI serves as Albuquerque's single point of entry for people seeking outpatient counseling for problems with substance abuse." http://amci.unm.edu/ (2/28/13).

no alcohol use, but she reported having been drinking, as noted in the August 2009 record.  Hilton stated she used cocaine and heroin and that her "route for drugs" was by injection. [AR 335.] Hilton's prescriptions then were Depakote, Celexa, and Visteril.[21]

Hilton reported four previous psychiatric hospitalizations, but there are no corresponding records.  Her last admittance was in 2005.  She also reported she was assaulted and raped by a brother.  She could not read or write from 5th grade to 8th grade. [AR 335.] When she overdosed, she was on life support and lost oxygen to her brain.

Hilton's previous psychiatric diagnoses were affective/bipolar disorder, anxiety/panic disorder, and substance abuse disorder. [AR 335.] Other than Hilton's self reporting, it is unclear how these diagnoses were supported.  Hilton stated she attended the women's support group and the Suboxone group.  She felt spiritually lost.  She was married twice, had three children and four grandchildren. [AR 336.] She lived with a friend and was homeless.

Hilton stated her drug of choice was opioids which she "used IV."  "The patient admits to rarely [sic] use."  She began using more than 20 years ago.  She also used cocaine inhalants and admitted to the use at age 12.  She exhibited guilt related to her drug use and inability to stop use. [AR 336.] Hilton also admitted to "having missed work/school, been arrested, driven while intoxicated, harmed family, been told to cut down, attended AA/NA, suffered financially." [AR 336.] Medical consequences were: "black outs, hallucinations, memory loss, trauma, hospitalizations."

---

[21]"Visteril (hydroxyzine) reduces activity in the central nervous system. It also acts as an antihistamine that reduces the natural chemical histamine in the body. . . . Vistaril is used as a sedative to treat anxiety and tension. It is also used together with other medications given for anesthesia. Vistaril may also be used to control nausea and vomiting.  Vistaril is also used to treat allergic skin reactions such as hives or contact dermatitis."  http://www.drugs.com/vistaril.html (2/28/13).

The social worker noted "co-morbid psychological problems" that include: "affective disorder, anxiety disorder."   Hilton did not exhibit symptoms of "organic brain syndrome, schizophrenia, ADD, obsessive-compulsive dis., anti-social personality, gambling addiction, sex addiction, eating disorder."   She had mood swings and a lot of anxiety and symptoms of PTSD. [AR 337.] The patient's "sobriety date is 3/17/09 (but this is not accurate per the Aug. 2009 record), and she purportedly "had 6-9 mths in recovery."   She attended AA or NA/ meetings. [AR 337.]

Hilton had post acute withdrawal symptoms, including "labile mood, sleep disturbance, cognitive impairment, stress sensitivity, physical incoordination, memory problems."   "She has the post withdrawal symptoms because she has stopped taking her medication."   Her GAF, as of this date, was 45, with her highest GAF that year having been 55.[22]   There are no supporting medical records regarding a GAF of 55.   Hilton needed to get back on her medications as soon as possible. She had not taken her medications for a month.   Apodaca recommended NA to Hilton and noted her motivation as "good."   She had multiple symptoms of PTSD, bipolar disorder and addiction. Apodaca noted Hilton would benefit from getting individual counseling, but while discussed in numerous medical records, no counseling records are included in the administrative records.   It was never confirmed that Hilton went to counseling sessions. [AR 337.]

Apodaca added diagnoses of Bipolar Affective Disorder, Depressed, Severe, PTSD, Chronic (although it was already listed), and Generalized Anxiety Disorder. [AR 338.]

---

[22]The GAF is a subjective rating on a scale of 1 to 100 of "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000), at 32. A score in the range of 41–50 indicates "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning." Id. at 34.

Also on October 13, 2009, Dr. William Zolin at HCH saw Hilton. She had red sores all over her body and Dr. Zolin added Cellulitis as a current problem. Dr. Zolin's list of prescriptions indicates "Mrs. Hilton soon to be Mrs. Romero." [AR 248.] It is unclear what this meant. Dr. Zolin thought Hilton might have MRSA and prescribed Bactrim. [AR 248-49.]

While there is no documentation of a suicide attempt in this time frame, according to Hilton's report to a consultative examiner in January 2010, Hilton may have attempted suicide about three months before the January 2010 appointment, which could be in about October-November 2009. [AR 271.]

On November 2, 2009, Donna Mendoza, with HCH, saw Hilton. There was no suicidal ideation. Hilton discovered she had insurance thorough SCI Molina and needed information for a primary care doctor and a Medicaid card. Mendoza helped Hilton with theses matters. [AR 329-330.]

On November 5, 2009, Dr. Vega with HCH, saw Hilton. She needed a refill for Suboxone. She was supposed to be taking 500 mg. of Depakote but was taking half the dose. She was very moody and "down." She reported having done well on Suboxone and was clean of all drugs and alcohol. Her urine screen was negative. [AR 245.]

On November 10, 2009, Hilton was seen by Heidi Rogers, FNP-C, at HCH. Hilton was neither homeless nor in permanent housing the night before. She was feeling sick and not as enthusiastic as she had felt. She had sleep problems, night sweats, and was depressed. She was at her "wits end." [AR 243.] There were no relapses while taking Suboxone, and she had been on it for 7 months. She was to see "Tina" today although there is no corresponding record. Hilton felt Celexa helped but that Depakote brought her down. Her moods changed quickly. She noted a history of sexual abuse and trauma. Now that she was clean, she had flashbacks at night. She tried

14

a little Risperdal at night to see if her mood improved.  She was getting counseling through AMCI.  [AR 243.] However, there are no counseling records from AMCI.  Her current problems were still noted as Cellulitis, although it may have been resolved, along with Bipolar Affective Disorder, Depressed, Severe, PTSD, Chronic, Generalized Anxiety Disorder, Hepatitis C, Chronic, and Opioid Dependence. [AR 243-44.]

On November 13, 2009, Hilton applied for SSI.  She stated she started living at 1906 Minnie St. SW in Albuquerque on November 20, 2008, but that she did not live anywhere permanently.  The address of 1906 Minnie St. appears to be the home of her friend, Ivan Chavez, who submitted a third-party report. [AR 130.] Also on November 13, 2009, the disability services examiner conducted a face-to-face interview with Hilton but observed no problems. [AR 149-150.]

There is an undated disability report, wherein Hilton reported she could not read or write. [AR 152.] She had problems with her concentration, focus, and memory.  She was at a second grade reading and writing level.  She stopped working as of March 1, 2006, when she was incarcerated. [AR 153.] As of November 20, 2009, Hilton's listed medications were Celexa, Depakote, Vistaril, Sulfamethoxazole Trimethoprim,[23] and Risperdal.[24] [AR 239.]

On December 2, 2009, Hilton appeared to have filled out a lengthy function report.  Thus, there is some question about whether she was unable to read or write, or what help she might have received filling out this form and another.  There is no indication on the forms that Hilton filled them

---

[23]"Sulfamethoxazole and trimethoprim are both antibiotics that treat different types of infection caused by bacteria.  The combination of sulfamethoxazole and trimethoprim is used to treat ear infections, urinary tract infections, bronchitis, traveler's diarrhea, shigellosis, and Pneumocystis jiroveci pneumonia." http://www.drugs.com/mtm/sulfamethoxazole-and-trimethoprim.html (2/28/13).

[24]"Risperdal is an antipsychotic medication. It is an "atypical antipsychotic". It works by changing the effects of chemicals in the brain. Risperdal is used to treat schizophrenia and symptoms of bipolar disorder (manic depression)."  http://www.drugs.com/search.php?searchterm=Risperdal (2/28/13).

out with help.  She stated she lived in a shelter with friends, woke up in the mornings, drank coffee, showered, cooked there, watched television and slept. [AR 160.] She helped take care of her friend Ivan Chavez's animals.  She felt there was someone out there who wanted to get her. [AR 16.] She forgot to take her medications at times.

She could prepare dinner that took an hour, could clean the house and do laundry.  But, she only went out if she had to, and she took public transportation. [AR 163.] She shopped for food and hygiene about once a month.  She could not pay her own bills or handle money.  She had no hobbies and just wanted to sleep.  She was trying to learn to read and write.  She also stated she was going to group counseling.  Hilton had problems with her family because of what was done to her, and she did not want to be around anyone.  She reported problems talking, hearing, remembering, completing tasks, concentrating, understanding, following instructions, and getting along with others.  She did not deal well with people or change. [AR 165-66.]

On December 2, 2009, her friend Ivan Chavez filled out a third-party function report. [AR 169.] It is not clear if Ivan Chavez was a friend or a boyfriend.  He stated he spent about one-half the day around Hilton at a shelter.  He reported she performed the activities she listed in her report, but that she had a hard time dealing with people.  She worried too much.  She needed reminders but was irritated when she was reminded.  She had started to cook again.  Ivan drove her to counseling sessions.  Hilton was tempted to go and buy drugs. [AR 172.] Previously, Hilton could not deal with live responsibly, but Ivan was helping her.  She liked to read and watch TV, and he took her fishing at times.  She wanted to educate herself.  Hilton saw her children and grandkids or talked to them.  She attended church once in awhile.  She had trouble with memory, concentration, understanding, following instructions, and getting along with others.  She could not pay attention for long. [AR 169-75.]

On December 3, 2009, Ryan saw Hilton at HCH.  She was there for Suboxone but stated she had relapsed.  She was tearful and ashamed.  The urine test showed "false positive for Benzos as it had in past."  The urine test was positive for opiates and cocaine. [AR 332.]

On December 17, 2009, Ryan saw Hilton at HCH briefly for a refill of Suboxone.  Hilton was "hyper" that day. [AR 317.]

On the same day, December 17, Hilton was seen by Cristina Carlson ("Tina" or "Carlson"), APRN-BC, a clinical nurse practitioner. [AR 319.] This is the first record by Carlson, who later provided her assessment of Hilton's psychological limitations.  While it is the first record, it is not clear if Carlson might have been seeing Hilton before this date since Carlson described Hilton as having talked more openly with her on this date.

Carlson described Hilton as being loaded down with clothes from donations and stuffed animals.  She was excited because her grandchildren from Ruidoso were coming to visit her for the holidays.  Hilton was currently renting a room from a friend, and her family would stay with her. She was trying to look at her relapse (apparently from early December) in positive terms and to move forward in her recovery.  She planned to speak at a vigil at Amistad for "sex workers."  She had speech problems and hoped to get speech therapy in January.  She talked more openly with Tina this day about her previous traumas, including her life on the street as a "sex worker."  Her thoughts were linear and logical.  Carlson described Hilton as more animated and bright that day.  She was doing well on Suboxone.  Hilton planned to start group counseling in three days but could not tell Tina where she was going to do that.  There are no corresponding counseling records. [AR 319.]

### 2010 Medical Records:

On January 7, 2010, Tina again saw Hilton, whose affect was flat and mood was depressed. Her insight and judgment were good. [AR 313-14.] Hilton's active problems and medications appear

17

to be the same as before, except Celexa is also listed as a new medication, after which Tina asked if it was possible to provide this medication because Hilton was awaiting General Assistance and had no funds. [AR 314.]

Hilton reported she was staying with a friend but had been "tripping lately" and "flipped out" when she got very angry at her ex-husband for dying. Hilton stated she threw a tantrum and was throwing things all over the place; friends took care of her. Hilton was out of medications for a few days and had not taken Risperdal for a week, during the time she was so anxious. Hilton heard voices and whispering that was more intense lately. She was staying clean and denied relapses. She applied for General Assistance and was awaiting those benefits. She had no money for refills and was fearful she would relapse if she did not get back on her "psych" medications. She was sleeping poorly. [AR 314.] Carlson noted that according to HCH's pharmacy, Hilton could refill her medications at UNM as she was on the "no co-pay" list there. [AR 315.]

On January 10, 2010, Disability Services denied Hilton's SSI application, noting diagnoses of Hepatitis C and Schizoaffective D/O, depressed type. [AR 11, 59.]

On January 13, 2010, Carlson observed Hilton as labile, guarded, with pressured speech, and depressed. Hilton continued to buy Suboxones on the street and stated she was "losing her mind." She tried to get on the Suboxone program at First Choice and had an appointment with them at 2 p.m. that day. She was staying with friends, but the record again indicates Hilton was "doubling up" as to housing. [AR 351.] Hilton had not taken medications for three days and planned to get refills today. She felt the medications helped. She described fighting a lot and feeling paranoid. She denied alcohol use. She was manic. Carlson urged her to get into the Suboxone program. [AR 351.]

On January 14, 2010, Cathy L. Simutis, Ph.D, performed a consultative examination of Hilton. [AR 271.] A friend drove Hilton to the appointment. Hilton reported that she lived in

18

Albuquerque for most of her life and was presently living with Ivan, who gave her a room to stay in. [AR 271.] Hilton was born in Las Cruces and grew up in Hatch, New Mexico. She lived then with her mother, stepfather, four brothers, and a sister. Her stepfather and older brother sexually abused her between the ages of 11 and 13, before she left home. Hilton recently held a job at "Top Dog," where she cleaned and made french fries but then said that job was years ago. She left that job when she was sent to prison. She was unable to work and could not read or write. She had difficulty understanding what was told to her.

Hilton stated she had tried to commit suicide four or five times, with the most recent attempt three months ago – about October 2009. There are no corresponding medical reports. She also said she had been in substance rehabilitation four or five times.

Hilton had problems remembering to take her medications. She thought she missed three doses that week because she was too tired. Carlson just increased the dosage of her medications. Hilton reported having more nightmares that felt real and flashbacks every two days. She had intrusive memories that occurred when she was cooking, so she stopped cooking. She was hypervigilant and felt she "startled" easily. She did not trust people. She was keyed up and had problems concentrating. She felt sad most of the day although she tried to hide her sadness. Hilton cried two times a week, and lost interest in activities that she used to enjoy. She claimed to have gained 40 pounds in a year, although the records do not confirm such a weight gain. Hilton thought of death every day. She denied current use of alcohol or drugs and had been sober since January 1, 2010, just four days before this appointment. [AR 272.]

Hilton showered every other day. She avoided cleaning but could do laundry. She lay on the couch and tried to read. She did not spend time with friends, but Ivan, her friend, took her places. Her GAF was 40. She exhibited good eye contact. She was oriented, calm, and cooperative.

19

Dr. Simutis noted no indications of psychotic thought process, although Hilton reported auditory hallucinations every day for five minutes. Hilton stated she spent approximately ten years total in jail or prison. [AR 273.] She was "trying for stability" but described her mood as bad. Her memory was worsening. Dr. Simutis found that her intelligence appeared to be below the average range. She did not conduct extensive testing, but noted that Hilton was unable to correctly do reverse serial 7s, reverse serial 3s, or reverse serial 2s. Her insight and judgment were adequate. Dr. Simutis found diagnoses of shizoaffective disorder, depressed, PTSD, polysubstance abuse. [AR 273.] Hilton's prognosis was guarded. Her ability to understand and remember instructions, concentrate and persist on task, and interact with co-workers and the public all were "moderately limited." Hilton's ability to adapt to change was only mildly limited. [AR 273.]

On January 18, 2010, Ryan saw Hilton at the REC program. Hilton told Ryan that she would get outside one-on-one counseling, and they both talked about how much Hilton needed it. But, there are no counseling records. [AR 311.]

On January 20, 2010, Richard Reed, Ph.D, performed a Mental RFC Assessment. [AR 274.] He found moderate limitations in many areas, including Hilton's ability to remember locations and work procedures and to understand and remember very short and simple instructions. She had marked limitations in the ability to understand and remember detailed instructions. Hilton had moderate limitations in all categories of social interactions but was not limited in her ability to maintain socially appropriate behaviors and neatness and cleanliness. [AR 275. ] Dr. Reed engaged in a lengthy discussion and review of Hilton's medical records, nothing that while she stated she was going to counseling at AMCI, there were no corresponding records. During the consultative exam with Simutis, Hilton reported not having used drugs for four days as of that date and not having used cocaine since December 15, 2009. Dr. Reed observed that this latter date was contradicted by what

Hilton told her treating provider as to the August 2009 date when she abused drugs. Dr. Reed found Hilton's statements about the severity of her psychiatric symptoms and alcohol/substance abuse to be less than fully credible. He concluded Hilton could understand, remember and carry out simple instructions, make simple decisions, attend and concentrate for two hours at a time, interact adequately with co-workers, and respond appropriately to changes in routine work settings. [AR 277.]

Dr. Reed also filled out an PRT form on January 20, 2010. He evaluated listing numbers 12.03, 12.06, and 12.09, but found Hilton did not meet the diagnostic criteria for schizoaffective disorder, depression, PTSD, or opioid dependence. The required "B" and "C" criteria were not met for listing requirements. [AR 278.]

On January 21, 2010, Carlson saw Hilton, who she described as having pressured speech and a depressed mood. But, Hilton was cooperative, her appearance was appropriate, and she had good insight and judgment. [AR 308.] Hilton reported having PTSD symptoms, flashbacks, and nightmares. She stated that next month was the anniversary of the death of "partners." "I see them and smell them." Hilton was paranoid and isolative. She was not using opiates or other drugs. She felt dirty and angry with herself about her trauma symptoms. She took a friend's Seroquel[25] with

---

[25]Seroquel "is used to treat certain mental/mood conditions (including bipolar disorder, schizophrenia). Quetiapine is known as an anti-psychotic drug (atypical type). It works by helping to restore the balance of certain natural substances (neurotransmitters) in the brain. This medication can decrease hallucinations and improve your concentration. It helps you to think more clearly and positively about yourself, feel less nervous, and take a more active part in everyday life. Quetiapine can help prevent severe mood swings or decrease how often mood swings occur."
http://www.webmd.com/drugs/drug-4718-Seroquel (2/28/13).

Gabapentin[26] which helped her sleep.  She was not taking her medications at this time as she could not pay.  Carlson was going to try to get medications for Hilton and wrote to St. Martins asking for one-time assistance. [AR 293, 307.]

Hilton requested reconsideration of the disability services' initial denial of SSI.  She filled out a disability report but described nothing had changed or worsened since her November 2009 report. [AR 191.] She reported taking Citalopram for depression, Depakote for a mood stabilizer, Gabapentin for leg cramps, Risperdal as a psych medication, Seroquel for sleep aid, and Suboxone for substance treatment.

In February 2010, Hilton appears to have filled out another function report.  She was living with friends.  She had coffee in the morning, showered, and went to appointments. [AR 198.] She helped feed Ivan's dogs and clean up.  She worried so much that she could not sleep. [AR 199.] Hilton needed reminders for appointments.  She could not always prepare food, but cleaned the house and washed, even though it might take her 23 hours to do those things.  Hilton did not go outside  much.  She walked or used public transportation if she did.  She felt she might get lost if she drove.  Ivan handled money matters. [AR 201.] Her hobbies were lying down and watching television. [AR 202.] Hilton liked to be alone and did not want to be around people.

On February 4, 2010, Hilton was seen at HCH by Forrest Sweet.  This record indicates Hilton was transported to her social security attorney's office. [AR 305.]  On February 5, 2010, Carlson again saw Hilton, who she described as having a flat affect, guarded attitude, and slow speech.  Her appearance was appropriate but Hilton's mood was depressed.  She exhibited low self

---

[26]"Gabapentin is used with other medications to prevent and control seizures. It is also used to relieve nerve pain following shingles (a painful rash due to herpes zoster infection) in adults. Gabapentin is known as an anticonvulsant or antiepileptic drug."  Can also be used for restless leg problems. http://www.webmd.com/drugs/mono-8217-GABAPENTIN (2/28/13).

esteem and felt guilty.  Her insight and judgment were fair. [AR 302-03.] Hilton reported getting

very angry and paranoid lately and was angry at herself for being molested over the years.  The

record states she "has not been getting counseling and feels out of control with her sx [symptoms]"

Hilton was currently staying with Christian friends "who did not know what to do with her."

Carlson described Hilton as being very triggered, agitated, labile emotionally all the time.  She

needed counseling urgently, and Carlson referred Hilton to Peggy Harter's "walk in hours." [AR

303.] There are still no records confirming that Hilton ever obtained counseling.

On February 16, 2010, Hilton obtained some refills of prescriptions at HCH. [AR 300.] On

February 18, 2010, she saw Ryan and requested Suboxone.  She was stressed out that morning and

said she was staying with a friend.  The record indicates she "doubled up" the last night.  Hilton had

plans to move in with Ivan, who was clean and would be supportive in her recovery.  Other records

indicated that Hilton was already living at Ivan's place at times.  Hilton's urine screen was negative.

She stated that she attended REC group weekly [AR 298], although the records do not always

document regular attendance.

On February 21, 2010, Ivan filled out a second third-party function report.  This time, he

stated he had known Hilton for 30 years.  Hilton helped with breakfast and the dishes; she assisted

with cleaning and getting dinner ready. [AR 183.] Ivan stated that Hilton had "issues" all her life.

She did not have problems with her daily care, but needed medications to sleep and tended to get

depressed.  Hilton went outside and used public transportation to get around, or took a ride.  She

shopped for food.  She liked to read and was trying to read better.  Hilton visited some family and

friends.  She got frustrated and confused and upset with people.  She always had these problems.

[AR 183-88.]

On March 3, 2010, Carlson saw Hilton at HCH.  She was there to get a refill of Seroquel.  She was cooperative.  She stated that her daughter was ready to give birth to a baby and that this helped "put the trauma off a little bit."  She was very focused on all of the terrible things that happened to her but was much calmer today.  She was taking her medications as prescribed and the increase in Seroquel helped.  She had not gone for counseling yet, but she planned to go tomorrow during walk-in hours.  Hilton's thoughts were linear, logical and well organized.  She wanted to switch to a mood stabilizer due to concerns about weight gain.  Hilton was staying with a friend and her pregnant daughter.  Carlson prescribed Lamictil[27] and instructed her to watch for rashes. [AR 390-92.]

On March 19, 2010, Hilton saw Dr. Vega at HCH.  She had been staying off heroin.  There were no slips although "occ cocaine." [AR 388.] The Suboxone was working well.  Hilton had been more depressed and counseling was again recommended.  She was to start counseling next week.  She looked tired and tearful but coherent.  Her urine screen was positive for cocaine. [AR 388.]

On March 31, 2010, disability services denied Hilton's request for reconsideration.  While she had diagnoses of schizoaffective disorder and PTSD, the conditions were not severe enough to prevent her from working. [AR 60, 73.]

On April 6, 2010, Hilton requested a hearing before an ALJ.  She stated she was unable to work due to "severe psychiatric and physical impairments" [AR 78], although none of the medical records indicate she had physical impairments or physical symptoms from Hepatitis C.

---

[27]Lamictal or "Lamotrigine is used alone or with other medications to prevent and control seizures. It may also be used to help prevent the extreme mood swings of bipolar disorder in adults. Lamotrigine is known as an anticonvulsant or antiepileptic drug. It is thought to work by restoring the balance of certain natural substances in the brain."  http://www.webmd.com/drugs/drug-8486-Lamictal (2/28/13).

In an undated disability report, Hilton noted nothing had changed since her last report.  Her medications were the same. [AR 211-13.]

On April 10, 2010, Carlson saw Hilton at HCH.  Hilton started Lamictil but did not like the way she felt on it.  She missed her last appointment because her daughter gave birth.  Hilton was taking Depakote but felt like she was going crazy.  She could not concentrate.  She took herself off medications due to her weight gain.  She had not taken them for four days and did not have refills.  Carlson described Hilton as labile and agitated.  Hilton was staying with friends although the record indicates she "doubled up" the night before.  Hilton was distracted and losing things.  She could only sleep a little and was laughing inappropriately at times.  She was manic off the medications. [AR 383.]

On April 16, 2010, MacLeod saw Hilton at HCH for a refill of Suboxone.  Hilton denied cravings/triggers/adverse side effects.  The record notes that Hilton's urine screening was positive for cocaine at the last appointment; it appears that Hilton claimed it was positive due to people around her who smoked crack where she was staying.  She denied a relapse. [AR 386.] Hilton was stressed because she lost her wallet on the way to the appointment and feared her niece might use her social security number to buy drugs.  The urine screen was deferred until Hilton's next appointment. [AR 386.]

On May 13, 2010, Hilton saw MacLeod at HCH for a refill of Suboxone.  She denied relapses.  She attended the women's group once a week.  She had discussed housing "with Donna at Stars."  Hilton wanted to taper off Depakote due to the weight gain, but she did not start

Topamax[28] after her last appointment with Carlson because the prescription was not available at UNM. [AR 381.]

On May 27, 2010, Hilton was seen by nurse Engren at HCH. She was tapering off Depakote and taking Topamax. [AR 379.] On June 10, 2010, she saw Dr. Vega at HCH. She reported no relapses or other drug use. Dr. Vega did not order a urine screen since he was unsure if the HCH budget allowed it for non-REC screens. [AR 377.] On June 17, 2010, Hilton again saw Dr. Vega. She requested a refill of Topamax. She was completely off Depakote. She still felt irritable and moody. [AR 375.]

On July 2, 2010, Carlson filled out a questionnaire concerning Hilton's limitations although it does not appear that Carlson had seen Hilton for a period of some months. (There is a page 3 of a medical note, dated 4/20/10, by Carlson [Doc. 385]). Carlson stated she had treated Hilton from December 2009 to the present, a period of about 8 months. Hilton's diagnoses were: bipolar mixed, PTSD, chronic, Opiaite Dependence, Borderline Intellectual Function, Hepatitis C. Hilton's mood was unstable. She had rages, severe anxiety, flashbacks. She was paranoid. She was referred to counseling, but no records indicated she ever attended counseling. Her medications were listed. The plan was to stabilize Hilton's housing situation and ongoing recovery work. [AR 342.] The questionnaire included listing criteria for 12.02, 12.03, 12.04 and 12.06. Carlson found most of Hilton's limitations in all areas to be marked. She also found that Hilton had three episodes of deterioration or decompensation. According to Carlson, Hilton had a severe condition like this for

---

[28]Topamax or "Topiramate is used alone or with other medications to prevent and control seizures (epilepsy). This medication is also used to prevent migraine headaches and decrease how often you get them." http://www.webmd.com/drugs/mono-6019-TOPIRAMATE (2/28/13).

10 years, ongoing.  Carlson filled out a Mental RFC Assessment, finding almost every limitation to be marked. [AR 348-49.]

On July 9, 2010, Hilton saw MacLeod at HCH.  She obtained a Suboxone refill.  She graduated from REC on April 10, but admitted to "doing a line of coke recently" because she put herself in a vulnerable environment while stressed out about her daughter's boyfriend stealing things.  Hilton admitted she sabotaged her recovery and assumed her boyfriend would kick her out because of the theft. [AR 371.] But, Hilton's boyfriend reassured her that she could stay with him.  He wanted to help prevent a relapse.  The record appears to say Hilton had been dependent on the boyfriend for more than six months and needed to be transitioned to First Choice.  The urine screen was completed but insufficient urine was collected.  Hilton was notified she would need to provide sufficient urine for a specimen at the next appointment.  MacLeod was calling First Choice to assist Hilton in scheduling a new patient appointment.

On August 2, 2010, Hilton's attorney wrote to the ALJ, requesting an "on the record" favorable decision, without the need for an administrative hearing. [AR 88.] Hilton's attorney reviewed some of the medical records, including Dr. Simutis's notation that Hilton's gross intelligence was below average, and Carlson's diagnoses.  Counsel argued that if this evidence was insufficient on the record, counsel requested a neuropsychological evaluation, including testing of Hilton's IQ, memory, and cognitive ability. [AR 88.] Hilton's attorney asserted that her client was homeless, unable to read or write, had a history of sexual molestation by family members, and physical abuse while on the street.  She did not start taking medication until going to HCH.  While counsel admitted that Carlson might not be a medically acceptable source, she argued that Carlson's diagnoses should be considered when other evidence confirmed the same diagnoses.  Counsel

claimed that Hilton had been off drugs since August 2009, except for a brief relapse in December 2009. [AR 91-92.] Based on the medical records, this is not accurate.

On August 18, 2010, Hilton saw Carlson.  She was tearful, labile, had increased PTSD symptoms, nightmares, flashbacks, rages, and hypervigilence. [AR 366.] She reported that her stepfather, who was one of her abusers, was currently dying and had called her to visit him.  Hilton struggled with her anger and with thinking she should forgive him.  She was also troubled about being transferred away from HCH.  She was out of her "psych" medications for two weeks.  She was staying in an apartment and open to counseling.  Hilton reported she was staying clean but felt like relapsing when she was this stressed.  Carlson referred Hilton to Pathways AMCI for a counseling voucher. [AR 366.]

On August 18, 2010, Hilton also saw MacLeod and requested a refill of Suboxone.  Hilton had an appointment with Jeff Leibertoff at South Valley's First Choice the next day to begin orientation for Suboxone/Primary Care.  Hilton stated she missed her refill appointment with MacLeod on August 13 because her brother was run over and Hilton was at the hospital.  Hilton reported she relapsed on Percocet and alcohol on August 15, 2010.  She requested "psych" medication refills today.  She was with a boyfriend still but admitted she wanted to relapse and become homeless again so she could continue getting services with HCH.  She verbalized rage at her stepfather and brother for denying they sexually assaulted her during her childhood.  She had seen her stepfather on August 15, and felt she was going to explode.  She did not feel capable of confronting or forgiving her stepfather.  She sporadically attended weekly Suboxone group meetings.  [AR 369.]

On August 25, 2010, Hilton again saw MacLeod for a refill on Suboxone and the urine results collected on August 18, 2010.  She admitted to using cocaine and alcohol after her stepfather

asked her to visit.  She denied a relapse today and was prepared to repeat the urine screen.  She reported she went to meet with James Leibertoff at First Choice but his appointment schedule was full that day.  She was to see him next Tuesday, but there is no corresponding record.  She confronted her stepfather following her August 18 appointment and asked why he sexually abused her.  When he did not respond, Hilton hit him.  He then admitted the abuse and apologized.  Hilton intended to use the AMCI counseling voucher next week.  She was staying at her boyfriend's home, but the boyfriend was recently incarcerated for DWI.  Hilton's attendance at the Suboxone group was sporadic.  MacLeod encouraged her to attend regularly. [AR 364.]

On November 2, 2010, Hilton saw Carlson.  She requested restarting her medications as she had been out of them for a month.  She was tearful and had racing thoughts.  Carlson noted Hilton's visit with her stepfather, but this record indicates the stepfather told Hilton she was "f.....g crazy."  Hilton then went into a bad depression and hid in an apartment.  She started drinking alcohol for a month, but did not use drugs.  She stopped drinking as she knew it was not worth it.  She was seeing a counselor at First Choice.  She was "extremely emotionally labile."  She obtained Suboxone at First Choice but had to see a male counselor there.  She was getting into a lot of fights since not taking her medications.  Carlson noted that her medications were probably waiting for her at UNM but that she was unaware of it.  She referred Hilton to AMCI to see a female counselor and instructed Hilton to go to UNM for her medications. [AR 361.]

On December 13, 2010, Hilton saw Carlson again at HCH.  She was described as labile, with a guarded attitude and pressured speech, irritable, and having racing thoughts and fair judgment. [AR 354.] Hilton reported she was going crazy.  She was buying Suboxone off the street and felt shaky and sick.  She was unable to consistently obtain Suboxone from First Choice.  Hilton was trying to get counseling but stated she was told she could get a voucher next year.  She was currently

only taking 4 mg. of Suboxone every other day.  James, her First Choice counselor, told Hilton the doctor there would call Carlson but the doctor did not call. [AR 356.]

**2011 Records:**

There are no more medical records.  On March 8, 2011, Hilton attended the ALJ hearing with counsel. [AR 24-58.] Hilton's attorney again requested a full neuropsych or psych testing for Hilton. The ALJ took the request under advisement but ultimately did not order testing. [AR 28.] The attorney gave an opening statement, in which she summarized Hilton's history, sexual abuse, homelessness, prison time, substance abuse, relapses, psychotic symptoms, and diagnoses.  Hilton's attorney stated that her last drug use was in August 2010, but it is not clear if Hilton's last drink was in August 2010. [*See* Nov. 2, 2010 record discussing alcohol use for a month.]  Counsel argued that Hilton met listing requirements and asserted that drug abuse should not be considered materially contributing to her alleged disability. [AR 30.]

While Hilton rarely complained of side effects of medications during her medical visits, at the hearing she said that certain medications made her neck twitch. [AR 33-34.] She claimed she last drank or used cocaine in 2010. [AR 35.]

With respect to her childhood, Hilton stated she was told she did not speak until age 8 and did not walk until age 6.  She discussed her many alleged symptoms and problems. [AR 37-51.] The ALJ provided a hypothetical to the VE, indicating there were no exertional limits, but that Hilton could only perform work that needed little judgment, and work that included simple duties to be learned on the job.  There should be no interaction with the public and only occasional interaction with co-workers.  No production, pace, or assembly work was possible.  The VE testified, as noted above, that there were three positions Hilton could perform with these limitations and that the jobs did not involve talking or work with the public. [AR 54.]

On April 18, 2011, the ALJ found Hilton was not under a disability. [AR 11-18.] On June 3, 2011, Hilton requested review and submitted a letter brief to the Appeals Council. [AR 6, 225.] On March 28, 2012, the Appeals Council denied review.

## V.   DISCUSSION

### A.   Alleged Legal Errors

Hilton sets out the following alleged errors: (1) the ALJ failed to obtain necessary psychological testing, which might have shown Hilton's intellectual functioning met a listed impairment [Doc. 20, at 7-9]; (2) the ALJ erred by failing to find Hilton met listing criteria at Step 3 and improperly discounted or rejected Ms. Carlson's assessment [Doc. 20, at 10-14]; (3) the ALJ erred in her credibility findings [Doc. 20, at 15-17]; and (4) the ALJ erred in her step 5 findings because the ALJ's hypothetical was inaccurate or incomplete [Doc. 20, at 17-21].  Hilton argues that the evidence in this case is sufficient for "outright reversal" for an award of benefits.  If not reversed, Hilton requests on remand, that the Court order full neuropsychological testing. [Doc. 20, at 22.]

### B.   Analysis

#### 1)   Development of the Record– Psychological Testing:

The Commissioner has a duty to ensure that an adequate record is developed relevant to the issues raised.  *See* Hawkins v. Chater, 113 F.3d 1162, 1164 (10th Cir. 1997).  The appropriate inquiry is whether the ALJ met her responsibility to ensure the record was sufficiently developed to decide the issues presented at the hearing. *See* Grogan v. Barnhart, 399 F.3d 1257, 1263–64 (10th Cir. 2005) (noting that if medical evidence in the record is inconclusive, a consultative examination is often required for proper resolution of a disability claim).  *See also* 20 C.F.R. §§ 404.1519a(b) (stating agency may purchase consultative examination if evidence is insufficient for a decision).

31

In Harlan v. Astrue, 2013 WL 470489, at *4 (10th Cir. Feb. 8, 2013) (unpublished), the Tenth Circuit Court of Appeals instructed:

> after the claimant satisfies her burden to show a reasonable possibility of a severe impairment, the ALJ bears responsibility to order a consultative examination if it is necessary to resolve the impairment issue. Hawkins, 113 F.3d at 1167. But the ALJ "has broad latitude in ordering a consultative examination." Diaz v. Sec'y of Health & Human Servs., 898 F.2d 774, 778 (10th Cir.1990); see also Thompson v. Sullivan, 987 F.2d 1482, 1491 (10th Cir.1993) (stating ALJ has discretion to order consultative examination).

"[W]here there is a direct conflict in the medical evidence requiring resolution or where the medical evidence in the record is inconclusive, a consultative examination is often required for proper resolution of a disability claim.  20 C.F.R. § 404.1519a(b)(4); Thompson, 987 F.2d at 1491.

Here, Hilton emphasizes disability reports indicating her problems with intellectual functioning, her difficulties understanding and remembering, and her minimal education. [Doc. 20, at 7.] She further argues that Dr. Simutis's consultative examination showed Hilton's gross intelligence was in the "below average range."  Hilton relies heavily on Cristina Carlson's diagnosis of borderline intellectual functioning and Carlson's assessment. [AR 342.]

Hilton takes issue with the ALJ's reference to the Mental RFC form filled out by state agency reviewing physician, Dr. Reed, on January 20, 2010.  She argues that the reviewing physician did not consider Hilton's low level functioning.  According to Hilton, Dr. Simutis's opinion that Hilton's intelligence was below average should have triggered a request for a consultative psychological evaluation for purposes of determining "how far below average claimant's intellectual functioning was." [Doc. 20, at 9.]

Hilton argues that the lack of any formal intellectual testing "colors evaluation of all other sections," including step 3 findings.

The Commissioner contends that consultative psychological testing was not necessary because the record did not indicate that medical evidence was inconclusive, incomplete, or conflicting. Moreover, the Commissioner already arranged a consultative examination conducted by Dr. Simutis on January 24, 2010, who concluded that Hilton's intelligence was in the below average range. The ALJ considered that opinion. [AR 271-73.]

The Commissioner also points out inconsistencies in the record about Hilton's ability to read or write, including Hilton's statements that she could not read or write, counsel's statements that Hilton has difficulty reading and writing, Hilton's apparent ability to fill out several disability forms in her own handwriting, a third-party's statement that Hilton liked to read and that she read often, and Hilton's comments that she was trying to read better.

Moreover, according to Defendant, the record is clear that Hilton had a limited eighth grade education, obtained by attending special education classes. Based on this information, the Commissioner had enough information to make an informed disability decision, without the need to order further psychological testing or another consultative examination. [Doc. 23, at 6-7.]

In her written decision, the ALJ considered all of the evidence of record in relation to Hilton's cognitive abilities, including Hilton's own statements, Dr. Simutis's evaluation and report, and disability services physicians' assessments. [AR 13, 14, 15, 16, 17.] The ALJ specifically stated that she took under advisement counsel's request for psychological testing, but declined the request based on her conclusion that the medical opinions from state agency consultants provided sufficient evidence "that even with low level functioning, claimant is capable of engaging in functional

activities specified" in Dr. Reed's Mental RFC Assessment and "Exhibit 7"[29] and as testified to by the vocational expert.  [AR 17.]

The Court agrees that the ALJ sufficiently developed the record with respect to Hilton's mental or intellectual capacity and that she did not err by not ordering an additional consultative examination or more thorough psychological testing.  The records relied on by the ALJ are, for the most part, consistent.  According to the ALJ and her review of the record, Dr. Simutis's opinion of "gross intelligence below average range" did not indicate Hilton was unable to work at some level in the economy. [AR 16.]

The ALJ's relied on Dr. Simutis's opinions that Hilton was moderately limited in her ability to understand and remember, moderately limited in her ability to concentrate and persist in a task, and moderately limited in her ability to interact with co-workers and the public.  Hilton was mildly limited in her ability to adapt to change. [AR 16, 273.]

The ALJ noted that Dr. Reed's limitations, as set out in the Mental RFC Assessment [AR 274-77] were similar to those of Dr. Simutis. [AR 16.] Hilton was moderately limited in the ability to understand and remember short simple instructions, to concentrate, and to function socially.

Dr. Wewerka, who completed a psychological analysis for the state agency, similarly concluded Hilton could perform "unskilled work" if medically compliant. [AR 16, 339.]

The ALJ also fully considered Carlson's opinion which conflicted with the above-mentioned opinions.  The ALJ stated that "certified nurse Christina Carlson in the psychiatric division at AHCH" was of the opinion that Hilton met a number of listings. [AR 16.] However, the ALJ

---

[29]The ALJ's reference to Exhibit 7 appears to be a typographical error.  Exhibit 7F is a letter from Carlson to St. Martin's requesting financial assistance for Hilton.  It seems that the ALJ meant to refer to Exhibit 6F, which was the Psychiatric Review Technique Form, also filled out by Dr. Reed on January 20, 2010. [AR 278-291.]

disagreed with Carlson's opinion as she found it not supported by a medical physician's or psychologist's assessments, nor did the ALJ find Carlson's opinion consistent with the record as a whole.  Further, the ALJ noted Carlson was not an "acceptable medical source." [AR 16.] Hilton argues that even if Carlson was not an acceptable medical source, her opinions and diagnoses were confirmed or supported by an acceptable medical source because Dr. Vega indicated diagnoses similar to those set forth by Carlson. [Doc. 20, at 10-11.] The Court is not persuaded.  The form-medical records relied on by Hilton's attorney to support this argument typically list the same or similar diagnoses from record to record.  The records never indicate who reached the initial diagnoses for Hilton, not what objective medical evidence supported the diagnoses.

In view of the ALJ's broad latitude in ordering a consultative examination, and based on the above-stated reasons and analysis, the Court concludes that the ALJ sufficiently developed the record in this case and committed no error by electing not to order psychological testing.

### 2)      Step Three Findings/Listings:

Hilton asserts that the ALJ erred by failing to find she had mental impairments that met multiple listing criteria and by failing to correctly apply the criteria of Social Security Ruling ("SSR") 96-3p.  Hilton states that the ALJ considered her mental impairments under only two sections – § 12.03 (Schizophrenia, Paranoid and Other Psychotic Disorders) and § 12.06 (anxiety related disorders), but that the ALJ also should have considered listing requirements of § 12.02 (organic mental disorders) and/or § 12.05 (mental retardation).

Much of Hilton's argument under this section addresses Christina Carlson's opinions or assessments.  Hilton  notes that Carlson is a clinical nurse practitioner at HCH, who treated Hilton since "at least" December 2009.  Based on the medical record, Carlson saw Hilton in December 2009, and on six subsequent visits through April 10, 2010 before filling out a questionnaire

35

concerning Hilton's mental impairments on July 2, 2010. [AR 342, 383.] Subsequent to filling out the July questionnaire, Carlson saw Hilton at three more times in 2010.

In the July 2010 questionnaire, Carlson noted diagnoses of bipolar mixed, PTSD chronic, opiate dependence, borderline intellectual function and Hepatitis C. [AR 342.] She based the diagnoses on "mood instability, rages, severe anxiety, nightmares, flashbacks, paranoia, ___." Carlson further wrote in the section supporting diagnoses that Hilton was "anoxic at birth,[30] dev delayed as child on Suboxone opiate ___." [AR 342.] Without more, the Court assumes that Carlson noted anoxia at birth and development delay based on self-reports by Hilton.  There are no corresponding medical records.  Carlson wrote that she provided treatment to Hilton in the form of "meds.," including Topamax, Celexa, Seroquel, and Hydroxyzine,  and that she referred Hilton for counseling and housing.  Carlson's recommendations and treatment plans for Hilton were stable housing and "ongoing recovery work." [AR 342.]

The remainder of the multiple page questionnaire sets out listing requirements for §§ 12.02, 12.03, 12.04, and12.06. [AR 343-46.] Carlson appeared to find that Hilton met the criteria for at least three of these listings and possibly all of them.  She further assessed Hilton with marked limitations in the daily living activities, social functioning, concentration, persistence or pace, and found that Hilton had three episodes of deterioration or decompensation in work or work like settings "which cause the individual to withdraw from the situation . . . ." Carlson stated this condition "at this severity" was ongoing for 10 years and that Carlson expected the condition at that

---

[30]"Cerebral hypoxia is a form of hypoxia (reduced supply of oxygen) specifically involving the brain; when the brain is completely deprived of oxygen it is called cerebral anoxia. There are four categories of cerebral hypoxia; in order of severity they are: diffuse cerebral hypoxia (DCH), focal cerebral ischemia, cerebral infarction, and global cerebral ischemia. Prolonged hypoxia induces neuronal cell death via apoptosis, resulting in a hypoxic brain injury." http://en.wikipedia.org/wiki/Cerebral_hypoxia (3/7/13).

severity to be "ongoing." [AR 347.] In the attached Mental RFC Assessment, Carlson marked

"markedly limited" for 16 out of 20 categories.  According to Carlson, Hilton was moderately

limited in her abilities to carry out very short and simple instructions, to ask simple questions,  to

maintain socially appropriate behavior and to travel in unfamiliar places or use public transportation.

[AR 348-49.]

As noted above, Hilton acknowledges that Carlson is not an "accepted medical source," but

argues that SSR 06-3p and its reasoning indicate that the ALJ should have given Carlson's opinion

"considerable weight."  Hilton argues that other evidence of record from an acceptable medical

source confirm findings of Carlson.  But, the Court rejected this position since the records relied on

by Hilton merely set forth lists of diagnoses and medications for Hilton that do not always change

from appointment to appointment.  In addition, those records typically do not describe what

information or testing supported the diagnoses or who originally reached the diagnoses.

Hilton also argues that the ALJ failed to specify the weight given to Carlson's opinions at

step 3, although admittedly, the ALJ indicated she gave Carlson's opinion some weight in

determining Hilton's RFC.  Hilton provides no support for the position that the ALJ is required, at

step 3, to set out how much weight she assigns to various providers' opinions.

In the written decision, the ALJ thoroughly discussed the opinions of record, including

Carlson's opinion, and she specified the weight she gave to those opinions.  At step 3, the ALJ noted

that Hilton's mental impairments did not meet listing criteria for 12.03 or 12.06. [AR 13.] The ALJ

discussed the requirements of "B" criteria for listings, including marked limitations in at least two

areas.  She noted that repeated episodes of decompensation mean the claimant suffered "three

episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." [AR

13.]

While Carlson found multiple episodes of decompensation, the Court notes that there is no supporting evidence of record other than possibly unconfirmed self-reports by Hilton. The ALJ observed that Hilton had experienced no episodes of decompensation which were of extended duration. [AR 14.] Moreover, despite allegations of psychiatric hospitalizations, the ALJ accurately found there were no corresponding medical records.

In finding that Hilton suffered mainly from moderate rather than marked restrictions, the ALJ relied on record evidence, including Hilton's ability to engage in daily activities. Treatment records and third-party statements indicated Hilton continued to interact with family members but avoided contact with others. [AR 14.] With respect to Hilton's ability to concentrate and persist on task, the ALJ determined Hilton had moderate difficulties as supported by the consultative doctor's report and state agency assessments. [AR 14.] The ALJ carefully documented why she did not find at least two "marked" limitations, etc. and why she did not find that Hilton met paragraph "C" requirements. [AR 14.]

In discussing Hilton's RFC, the ALJ noted the HCH social worker's assessment of a GAF of 45, but while agreeing that a GAF of 45 indicated serious impairments, the ALJ did not feel it was a true indicator of Hilton's level of functioning "as the inconsistency in maintaining therapeutic levels of medications results in exacerbation of symptoms." [AR 16.] There are multiple medical records supporting the ALJ's finding.

In addition, the ALJ discussed Carlson's opinions in some detail. The ALJ did not merely assign "some weight" to Carlson's assessments of Hilton, without further explanation. For example, the ALJ noted that Carlson was a certified nurse in the psychiatric division of HCH. The ALJ acknowledged that Carlson was of the opinion that Hilton met multiple listings. However, the ALJ explained that she disagreed with Carlson's opinion because it was not supported by a medical

38

physician's or psychologist's assessment. [AR 16.] The ALJ further found Carlson's opinion was not consistent with the record as a whole, which is accurate, and that state agency consultants and reviewing physicians' opinions that were consistent with the assigned RFC were entitled to considerable weight.  [AR 17.] The ALJ ultimately noted Carlson was not an "acceptable medical source" [AR 16], but she still considered Carlson's assessments and gave it some weight, although not controlling weight.

The Court determines, for the above-stated reasons, that substantial weight supports the ALJ's decision that Hilton did not meet listing criteria at step 3 and that the ALJ committed no error by not considering certain other listings as urged by Hilton.  In addition, the ALJ committed no error by assigning Carlson's opinions only "some weight."

### 3) Credibility:

"Credibility determinations are peculiarly the province of the finder of fact," although such findings "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."  Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995) (alteration and internal quotation marks omitted).  The reviewing court does not substitute its own judgment for that of the fact finder.  Moreover, a reviewing court recognizes "that some claimants exaggerate symptoms for purposes of gaining government benefits, and that deference to the fact-finder's assessment of credibility is the general rule."  Frey v. Bowen, 816 F.2d 508, 517 (10th Cir. 1987).  In addition, Tenth Circuit precedent "does not require a formalistic factor-by-factor recitation of the evidence so long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility."  Poppa v. Astrue, 569 F.3d 1167, 1171 (10th Cir. 2009) (alteration and internal quotation marks omitted).

In evaluating a claimant's credibility as to symptoms, the Commissioner considers all symptoms that can reasonably be accepted as consistent with the objective medical evidence and other evidence, reports of doctors, diagnoses, prescribed treatment, daily activities, efforts to work, and any other pertinent evidence.  20 C.F.R. § 404.1529(a).  A claimant's statements about pain or other symptoms alone does not establish disability.  Id.  In evaluating the intensity and persistency of symptoms and pain, the Commissioner considers all available evidence, including what medications have been used, how the symptoms affect a claimant's pattern of daily living, the location, duration, frequency, and intensity of pain, precipitating and aggravating factors, type, dosage, effectiveness of medications, treatment, or other measures used to relieve pain.  20 C.F.R. § 404.1529(c)(3); SSR 96-7p.

Hilton argues that the ALJ's credibility finding was not supported by substantial evidence. [Doc. 20, at 16.] She takes issue with the ALJ's finding about Hilton's "on again off again" use of medication and sporadic counseling, along with the ALJ assertion that evidence indicated increasing problems for Hilton during times of noncompliance with medications.  Hilton asserts that she had difficulties paying for her medications, as demonstrated by Carlson's one-time request to St. Martin's for financial help.  Hilton further contends that the ALJ's finding that "evidence indicates during periods of compliance the claimant is capable of engaging in work activity" is unsupported by any record citation or evidence.  Hilton claims she is unable to locate any record that suggests she could sustain employment. [Doc. 20, at 16-17.]

As noted by the government, Hilton does not appear to challenge the ALJ's characterization of Hilton's lack of treatment compliance issues and sporadic counseling.  Rather, Hilton appears to

argue that her noncompliance should not weigh against her credibility because of inability to pay

for medications.[31]

The ALJ engaged in a thorough discussion of Hilton's credibility, observing that the "issue

of credibility is an integral part of the decision-making process." [AR 15.] *See, e.g.,* Oldham v.

Astrue, 509 F.3d 1254, 1257 (10th Cir. 2007) ("credibility issue was critical to the determination of

disability"). The ALJ noted that she considered testimony and written statements "contained

throughout the record." [AR 15.] The ALJ highlighted multiple references to counseling sessions

in disability and HCH records, but commented that there were no corresponding counseling records.

While the ALJ found some of Hilton's allegations credible, they were not "fully credible,"

due to her "on again off again" use of prescribed medications. The ALJ noted several references

to Hilton's noncompliance with prescribed medications and Hilton's increased adverse symptoms

during noncompliance. Certainly, there is substantial evidence to support the ALJ's findings

regarding noncompliance, lack of counseling, sporadic use of prescriptions, and increased problems

when not taking medications as prescribed. [*See, e.g.,* AR 351 (off medications and feels like she

is losing her mind; fighting a lot and paranoid; manic); AR 334 (had not gotten medications, hearing

voices, wants to strangle people, happy one minute, depressed the next, little sleep); AR 245 (taking

less than prescribed amount of Depakote and very moody and down); AR 313 (been out of

medications and not taking certain prescriptions; been "flipping out" and angry with people,

throwing things); AR 307 (off medications because cannot pay, having PTSD symptoms, flashbacks,

nightmares, paranoid and isolative, sleeping poorly); AR 302 (not been to counseling, very angry

---

[31]While the ALJ did not make note of this, the undisputed medical evidence shows that Hilton
was a smoker and smoked every day. Somehow, she could afford to smoke even if she could not afford
her prescription co-pays.

and paranoid, very triggered, agitated, labile emotionally); AR 383 (took herself off medications due to weight gain and feels like going crazy, labile, agitated, laughing inappropriately); AR 366 (off psych medications for two weeks, and tearful, labile, nightmares, flashbacks, feels like relapsing, stressed); AR 369 (sporadic attendance of Suboxone group, missed appointment for refills; relapsed on drug use, feelings of rage); AR 361 (off medications; extremely emotionally labile; lots of fighting; tearful; bad depression).

The ALJ also found that the evidence indicated during periods of medical compliance, Hilton was capable of working at the level specified in the RFC. [AR 15.] Contrary to Hilton's position, the Court finds there is substantial evidence to support the ALJ's finding. For example, during visits when health care providers described Hilton as more stable or with fair to good judgment, she generally was "clean" from drug abuse or relapses, demonstrated good eye contact, had a job, said she went to counseling, was taking her medications, and her speech was linear, logical and well organized. [AR 250, 252, 257, 260, 262, 377, 379, 381, 390.] In addition, the ALJ relied on Dr. Wewerka's review of the records, who opined that when Hilton was medication-compliant, she appeared capable of unskilled work. [AR 16, 339.]

The ALJ did not expressly examine Hilton's inability to pay for certain medical prescriptions or the reasons she did not follow through with referrals for counseling. However, the record documents occasions when Hilton took herself off the medications, failed to get refills for various

reasons, could have obtained refills without a co-pay, did not realize for some reason she had insurance coverage, obtained vouchers for counseling, and bought drugs off the street.[32]

For all of the above-stated reasons, the Court concludes that the ALJ's credibility findings were  closely and affirmatively linked to substantial evidence and that the ALJ committed no error in assessing Hilton's credibility.

### 4)    **Step Five:**

Hilton argues that the ALJ erred in her step 5 findings because the inaccurate and incomplete hypothetical question to the VE did failed to encompass all of Hilton's impairments, including her limited reading and mathematical skills, along with her inability to concentrate. [Doc. 20, at 17.] Hilton again asserts that Carlson's findings and assessments were of "greatest significance," in that Carlson found marked impairments that should have been considered.

It is well-settled in this Circuit that an ALJ's hypothetical question must accurately reflect all, but only, the limitations borne out by the record. Decker v. Chater, 86 F.3d 953, 955 (10th Cir. 1996).  The ALJ's hypothetical required the VE to consider a person who could perform work that needed little judgment and who could do simple duties that could be learned on the job in a short period. [AR 52.] That person should have no interaction with the public and only occasional or superficial contact with co-workers and should not be required to work at a production pace "meaning sort of assembly job." [AR 53.]

---

[32]This disability case is complicated by Hilton's  many relapses into drug abuse.  While the ALJ did not emphasize Hilton's drug abuse and her continual relapses, there were very few significant periods from 2009 through 2010, when Hilton did not return to abusing alcohol or drugs.  An examination of the medical records, along with the multiple occasions when Hilton supposedly had false positive urine screens, demonstrates a number of relapses.

The VE testified that there was work the claimant could do with those limitations.  Indeed, the VE heard testimony about the claimant's ability to read and write, along with her educational level.  In testifying that Hilton could perform work that was available in the economy, the VE considered her age and education.

Moreover, the Court already rejected Hilton's position that the record supported additional mental limitations that should have been included in the hypothetical question.  Such limitations, including those found by Carlson, were not "borne out by the record."

The Court concludes that the ALJ committed no error at step 5 and that substantial evidence, in the form of the VE's testimony, supported the ALJ's step 5 findings.

## VI.   CONCLUSION

Based on the reasons discussed above, the Court concludes that Hilton's motion for reversal or remand is DENIED, and that the complaint is dismissed, with prejudice.

*Lorenzo F. Garcia*
Lorenzo F. Garcia
United States Magistrate Judge

44